# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 4:18-CR-00011-MFU-RSB |
| | ) | |
| SHABBA LARUN CHANDLER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

October 16, 2019:     United States District Court for the Western District of Virginia
Courtroom 1
Judge Michael F. Urbanski, Chief United States District Judge

*The Court:*     Okay. Let me ask you this question: Is there any other testimony, other than these two transcripts - - and these are of Lashaunda Washington and Ontwoinette Epperson, and I read them this morning. Other than these two transcripts, is there any state grand jury testimony that relate in any way to the charges in this case or in the 4:18CR12 that has not been turned over to these defendants?

*AUSA Heather Carlton*     No. And we weren't trying to hide these transcripts.

\* \* \*

*The Court:*     Okay All right. I appreciate you're telling me these two state grand jury transcripts are all there is. Mr. Newman, is that right?

*SAUSA Michael Newman*     Yes, your Honor, that's the only transcripts I'm aware of that touches specifically on the actions that are before your Honor today. The August 20th, August 24th, . . . I'm sorry June 15th or April 26 days.

COMES NOW, the Defendant Shabba, by counsel, Jeffrey L. Dorsey and Aaron B.

Houchens, and hereby submits this as his Memorandum in Support of Defendant's Motion to Dismiss.

## INTRODUCTION

Mere hours after the above exchange with the Court, the Government identified five other individuals who provided testimony to the multi-jurisdictional grand jury. In the Government's email to the Court and counsel making this disclosure, the Government advised that the list "is a listing of individuals who have testified in matters which we believe are or may arguably be related to the current prosecution." It included two defendants in this matter, one of whom is currently on trial - Tanikqua Fuller. Afterwards, the disclosures continued.

On October 17, 2019 at 10:15 p.m., in abrogation of its email the day before, the Government disclosed the multi-jurisdictional grand jury testimony of Courtney Davis. On page 74 of said testimony, Ms. Davis discusses intimate details of the North Hills Court shooting that took place on August 20, 2016. In her testimony, Ms. Davis identifies the shooters at the scene of the murder of Christopher Motley, and other details about the reason for the murder. Ms. Davis also testifies that she has spoken to others, who are witnesses to the events in question. Her testimony was transcribed in 2017 - a fact in contrast to Mr. Newman's affirmations above. Afterwards, the disclosures continued.

On October 18, 2019 at 12:16 p.m., the Government filed an Affidavit on behalf of Special Assistant United States Attorney Michael Newman (ECF No. 946) which contained additional facts about the multi-jurisdiction grand jury. The Affidavit revealed the existence of two special grand juries that had not been previously revealed, and that identity of the witnesses who appeared before those grand juries have been lost. Afterwards, the disclosures continued.

Later that day at 2:51 p.m., Heather Carlton advised the Court that additional grand jury

testimony of the key detectives in this case were being transcribed. Detectives Richardson and Whitley interviewed numerous witnesses and spearheaded the investigation of most of the alleged criminal activity relevant to this case. Ms. Carlton's email also listed other important law enforcement witnesses who provided testimony to the grand jury. As of the filing of this Memorandum, it is unclear the scope of the information that is forthcoming and/or lost forever.

## ARGUMENTS & AUTHORITIES

### I. THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY EVIDENCE FOR OVER A YEAR MANDATES DISMISSAL OF THE INDICTMENT AGAINST THE DEFENDANT

#### a. The Government Violated Its Discovery Obligations To Disclose The Exculpatory State Grand Jury Testimony

Despite being a member of the prosecution team, an elected Commonwealth's Attorney, and a Special Assistant United States Attorney in this matter for over 11 months, Mr. Newman failed to disclose to the defense the fact that he convened a multi-jurisdictional grand jury, and other special grand juries, to investigate these defendants and gang violence in Danville.[1] This suppression was suborned by at least one of the Assistant United States Attorneys, who as early as May 2018, knew of the existence of the multi-jurisdictional grand jury and the content of testimony elicited by Mr. Newman at those proceedings. When confronted by the Court about the issues of grand jury testimony and transcripts, Mr. Newman, at first, attempted to mislead the Court by striking a difference between tapes and transcripts. He then sat idly by as Ms. Carlton labored to explain the missing evidence to the Court. Ms. Carlton, who apparently lacked the requisite information, attempted to explain away the nondisclosure, eventually relented and

---

[1] A collective knowledge rule governs *Brady* claims. The knowledge of federal and state agents working with the prosecution is imputed to the Government's counsel. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). This applies to Mr. Newman who was working hand-in-hand with the Government since the inception of this case.

3

graciously admitted to the Court that additional time was needed to explore the issue.[2]

Regardless, at one point, Ms. Carlton told the Court that there were no other transcripts because "we swooped in and took it." Indicating that the Government usurped the investigation from the Danville authorities. Again, this does not appear to be the case as other transcripts are still being located and produced. This discussion took place as Mr. Newman peered on from counsel's table in silence- knowing full well the scope of his Danville investigation and his involvement. His failure to correct the record was a deliberate attempt to mislead the Court and his fellow prosecutors.

This suppression of evidence violates the Defendant's due process rights because (1) the nondisclosed evidence was material and favorable to the Defendant as it was both exculpatory and impeaching, (2) the evidence was willfully suppressed by the Government, and (3) prejudice ensued. *Brady v. Maryland*, 373 U.S. 83 (1963); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

### b. The State Grand Jury Transcripts, Produced To Date, Are Material And Favorable To The Defendant

Evidence is "favorable to the accused" under *Brady*[3] if it is either exculpatory or impeaching. *Strickler*, 527 U.S. at 281-82. More specifically, the Supreme Court has held that evidence which would be "advantageous" to the defendant qualifies under *Brady*. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). As such, the pertinent question when determining whether the Government acted improperly when it failed to disclose evidence is whether it could have impacted defense strategies or impacted the trial in any way. Here, even with the limited multi-

---

[2] How could Mr. Newman not know of the existence of transcripts that existed in 2017 when he told the Court that only two transcripts existed? The Courtney Davis transcript discussed the North Hills Court shooting and was presumably transcribed at Mr. Newman's request.

[3] Any reference to *Brady* or *Giglio v. United States,* 405 U.S. 150 (1972) refers to the analysis provided through both cases, which can be referred to as "Brady and its progeny."

jurisdictional grand jury testimony disclosed to date, it is apparent that both exculpatory and impeachment evidence was withheld for over a year.

First, LaQuante Adams' multi-jurisdictional grand testimony is ripe with impeachment material. To remind the Court, LaQuante Adams is an alleged Rollin 60s Crip gang member who has plead guilty and agreed to cooperate with the Government. He did not testify before the Federal Grand Jury and has not provided a record statement. Instead, the only information defense counsel has concerning his statements are contained in the notes from the multiple proffer sessions he engaged in. The Government intends to call Mr. Adams as a key witness in this case and he was prominently featured in the Government's opening statement.

In his proffer sessions, Mr. Adams details the alleged gang activities of the Rollin 60s Crips and discusses how they were involved in shootings throughout Danville, Virginia. He discusses the alleged membership roster of the Rollin 60s Crips and various other details concerning the gang's activities. This is in direct and stark contrast to his multi-jurisdictional grand jury testimony- which is the only sworn testimony that defense counsel has received from Mr. Adams.

In his multi-jurisdictional grand jury testimony, Mr. Adams states that he is "not into the group" when referring to the gang. He goes on to say that certain defendants in this case were not part of the Rollin 60s Crips, but were alleged to be members of a different gang. And depending on Mr. Adams' trial testimony, his multi-jurisdictional grand jury testimony may provide other impeachment material.

For these reasons, evidence of Mr. Adams' prior inconsistent statements is favorable to the Defendant because it would be used to the Defendant's advantage to impeach Mr. Adams. But due to the late disclosure, the Defendant is robbed of the opportunity to investigate the

statements made to the multi-jurisdictional grand jury.[4] *See United States v. Burns*, Case No.: 6:13-cr-00022 (W.D. Va. July 14, 2016) (holding that evidence is favorable to a defendant when it can be used for impeachment); *Davis v. Alaska*, 415 U.S. 308 (1974) (cross-examination has two separate constitutionally functions, including impeachment to uncover bias, prejudice or ulterior motives).

In addition to the disclosure of Mr. Adams testimony and despite Mr. Newman's assurances to the Court that none of the grand jury testimony concerned the North Hills Court shootings, the Government disclosed the testimony of Courtney Davis. In her testimony, Mr. Newman asks Ms. Davis "How about Christopher Motley, 124 North Hills Court?"[5] In response, Ms. Davis goes on to detail what she heard about the shooting from street sources.

In the most exculpatory of exchanges with Mr. Newman, Ms. Davis tells Mr. Newman that another potential shooter could have been involved in the murder of Christopher Motley. The exchange is as follows:

---

[4] In ruling on the Defendant's Emergency Motion to Continue, the Court noted that the defendants will have ample time to address the issues concerning the late disclosure of Deshaun Anthony's first statement to law enforcement. Mr. Adams is different because Mr. Adams *is a government witness* and Mr. Anthony is not. Further, it is extremely difficult to investigate new allegations in the midst of trial. Trial lasts at least eight (8) hours per day and defense counsel must have adequate time to prepare for the next day during the evening. To force the defendants to simultaneously investigate newly disclosed allegations about a key witness during trial places the defendant in a constitutionally untenable situation. Do they prepare for cross-examination or do they investigate Mr. Adams allegations?

[5] Of course, Mr. Newman assured this Court that the grand jury testimony had nothing to do with North Hills Court. How does the Court reconcile that statement in light of the fact that he was asking witnesses at the multi-jurisdictional grand jury about the very shooting at the heart of this case? The very shooting that the Government showed a video to the jury to begin its case.

Q. You know ... it was a lot of people shooting, right?

A. Yeah ... yes, it was like ... yes, it was like two more. The evidence ...

Q. Could it be both then? Could it be both Boosie and ... and ...

A. It could have been, because one of the things about it, if you think about it, Boosie ... he is under Peter Roll.

Q. Uh-huh.

A. And his rival is Kevin Trent, but Boosie and Kevin Trent were real close. I mean, they were seen ridin' around together, chillin' together, and that's one thing they have ... that's one conversation came up at a meetin'. Boosie was like, "Well, before I became Blood ... before y'all came around, it was me and Kevin every day. We didn't have nothin' to eat. We used to have to go in stores together and steal stuff for each other, but now that I'm Blood and he Crip, y'all gonna try to tell me I can't chill with this man." That was when the this came up. So Peter Roll ain't liked that either.

Q. So it's either Trents, or it could be ... very well be Peter Roll ... I mean ... I'm sorry ... Boosie, shooting ...

This shocking new information was never disclosed to defense counsel. In fact, upon receiving the transcript, the Defendant contacted the AOKI law firm and asked them to run an Invendia search for Ms. Davis. The results produced a scant amount of information and no where in the discovery was a statement provided by Ms. Davis concerning the North Hills Court shooting, nor was there any information regarding the fact that she testified before the state grand jury. Simply put, Ms. Davis was not disclosed as a potential witness in this matter until after the swearing in of this jury.

More importantly, Ms. Davis provides new information which implicates another shooter at the very murder at issue. It also potentially identifies information which could lead to other

7

persons who either witnessed the events in question or whom have other information. The identification of another shooter is, by definition, exculpatory.

### c. The Evidence Was Suppressed By The Government

The Court is well aware, from recent hearings and the evidenced produced therein, that all of the evidence referenced above has been withheld from the Defendant until after the swearing and seating of the jury. "Evidence is suppressed where it is known to the State and not disclosed to the defendant . . . Once the prosecutor acquires favorable information, even if she inadvertently fails to communicate it to the defendant, evidence has been suppressed." *Burns*, Case No.: 6:13-cr-00022 (W.D. Va. July 14, 2016) *citing Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015). Here, the information was known to Mr. Newman for years as well as the Detectives who investigated the case and testified before the state grand jury. Mr. Newman's Affidavit and Ms. Carlton's statement before the Federal Grand Jury also make clear that the Government has been in physical possession of at least two of the transcripts for an unknown period of time.[6] There is no doubt that the evidence was suppressed.[7]

### d. The Defendant Was Prejudiced By The Violation

The third component of a *Brady* violation requires that the defendant show that prosecutors' suppression of favorable evidence was prejudicial. *Strickler*, 527 U.S. at 281-82. Sufficient prejudice exists, for *Brady* purposes, if the suppressed evidence was "material."

---

[6] It cannot be overstated that in the May 30, 2018 Federal grand jury testimony of Lashanda Washington Ms. Carlton stated "Okay and in the Grand Jury, in the state grand jury, you said a couple things differently there than you've said here to the federal Grand Jury." (p. 89). How else could she have known that if the testimony of Ms. Washington was not disclosed to her prior to May 30, 2018? Ms. Carlton is an educated and experienced prosecutor. There is no doubt that she knew of the existence of the testimony of Ms. Washington at the state grand jury and failed to disclose this fact to defense counsel. Whether or not she had the transcripts is of no matter, she knew and sanctions should flow from her failure to disclose this knowledge.

[7] On October 18, 2019, Mr. Newman moved to withdraw from this case. This, however, is irrelevant to the issue at hand and cannot be a substitute for violation of the Defendant's due process rights. Mr. Newman should not be permitted to withdraw to avoid the consequences of his action. Withdrawal is not an escape hatch for misdeeds.

*Comstock*, 786 F.3d at 710 ("The suppression of favorable evidence is prejudicial if that evidence was 'material' for Brady purposes."). Evidence "is material if there is a reasonable probability that its disclosure would have produced a different result." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (internal quotations omitted). This requirement is met when "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434.

For two days, eight (8) African American defendants, six (6) of whom are facing mandatory life as a punishment, sat and watched as Government agents labored to explain why state grand jury testimony was withheld for over a year. The extent of the Government's mischief is still unknown, but even at this point it is clear that if this trial goes forward any verdict, innocence or guilt, will be tainted. While a witness has not testified, the Defendant has still been robbed of the opportunity to fully investigate the newly disclosed facts- including the alleged existence of a potential eyewitness to the murder. The Defendant has also been deprived of impeachment evidence due to Mr. Newman's failure to maintain adequate records or make the proper disclosures. The Government's failures are egregious and unconstitutional.[8]

Placing oneself in the shoes of the Defendant, as the Constitution demands, ensures the proper viewpoint to frame the analysis. If you were a defendant on trial, would you have confidence that the Government had complied with its discovery obligations and that a fair trial was set the ensue? The answer is clearly "No."

> II. **THE DEFENDANT HAS BEEN PREJUDICED BY MR. NEWMAN'S FAILURE TO PRESERVE ADEQUATE RECORDS AND THE DESTRUCTION OF EVIDENCE WHICH WAS ALL DONE IN BAD FAITH AND CONSTITUTES A DUE PROCESS VIOLATION**

---

[8] But for the careful attention to detail of another lawyer in a companion indictment this information would have never been disclosed.

The serious *Brady* violations outlined above mandate dismissal. So does the Government's failure to preserve exculpatory and potentially exculpatory evidence. In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333 (1988), the Supreme Court of the United States distinguished between *Brady* claims and those involving the Government's failure to preserve potentially useful evidence. With regard to spoliation of evidence, one court has said "[t]he issue . . . is not failure to disclose exculpatory evidence, the '*Brady* issue,' to which good or bad faith is irrelevant, but the '*Youngblood* issue' of "failure to preserve potentially useful evidence," which does turn on whether the police acted in good or bad faith. *Farmer v. Iowa*, 153 F.Supp.2d 1034 (N.D. Iowa, 2001).[9] However, with respect to a due process claim, "[f]ailure to preserve material exculpatory evidence violates due process rights irrespective of whether the Government acted in good faith or bad faith. *United States v. McNealy*, 625 F.3d 858, 868 (5th Cir. 2010) (*citing, inter alia, Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

Spoliation is defined as "the intentional destruction, mutilation, alteration, or concealment of evidence." Black's Law Dictionary 1409 (7th ed. 1999). In this matter, it is clear that the Government's concealment of this evidence, for whatever time period, constitutes spoliation. And the complete and utter failure to preserve the appropriate state grand jury records constitutes a constitutional violation of the highest regard.

Mr. Newman's affidavit makes clear that he has no record of the witnesses called to testify before the multiple state grand juries convened in this matter. He candidly admits in paragraph 17 of his Affidavit that "Similar to my office's practice of not keeping a list of

---

[9] Part of the reason for the difference in treatment is found in the observation made by the Court in *California v. Trombetta*, 467 U.S. 479, 486, 104 S.Ct. [2528,] 2532, (1984), that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. *See Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289 (1941).

witnesses that appear before the MJGJ, we did not keep a list of special grand juries or the witnesses." [ECF No. 946-1]. This constitutes unconstitutional spoliation. His Affidavit also makes clear that the tapes associated with this proceeding have been withheld from members of his own prosecution team.

This failure robs the Defendant of an opportunity to investigate the witnesses who testified or who were summoned to the state grand jury. It further prevents the Defendant from fact-checking the Government's claims as to the productions associated with the state grand jury proceedings. It shocks the conscience that an experienced prosecutor, elected in 2009 to the highest law enforcement position in a city with a population of over 40,000, would completely fail to maintain records of who testified before a special grand jury that he convened.

This failure is only exacerbated by the information produced by the Government to date. From the little information available about the state grand jury proceedings to date, it appears that multiple witnesses have provided impeachment and exculpatory evidence, under oath, to Mr. Newman. The late disclosure of this information has hampered the Defendant in the preparation of his defense. Additionally, without information as to who testified or was subpoenaed to testify before the state grand jury, the Defendant is without the opportunity to discover and investigate potentially exculpatory and relevant evidence. It is clear the Government has absolutely no idea who testified before the multiple state grand juries. This information may be lost forever, and if so, the Defendant will never be able to truly know if the information gleaned from testimony across three grand juries investigating homicides and shootings in Danville could have assisted in his defense in this matter. This is classic spoliation and sanctions must follow.

There is also bad faith.[10] To demonstrate bad faith, a defendant is required to present

---

[10] Of course, the Court need not reach the issue of bad faith if it finds that material exculpatory evidence was not preserved. At this stage and without additional disclosures by the Government, it is impossible to evaluate this

11

evidence either of egregious carelessness on the part of the police or misconduct on the part of the prosecutor that was tantamount to suppression. *State v. Langella*, 144 N.J. Super. 268, 282-83 (App. Div.), appeal dismissed, 74 N.J. 256 (1976). The bad faith is inferred from Mr. Newman's deliberate concealment of this evidence. He told the Court and counsel that the allegations of North Hills Court were not investigated by the grand jury, all the while knowing that he questioned at least one witness during the state grand jury proceedings about the shooting and learned exculpatory information. He told the Court that only two transcripts existed all the while knowing that his office possessed other transcripts from the state grand jury which were transcribed in 2017. There is also bad faith with regard to the concealment of impeachment evidence and the testimony of at least one trial defendant. The silence of Mr. Newman on October 16 and 17, 2019 was deliberate and deafening and was in furtherance of his efforts to conceal these transcripts and tapes. Finally, because the Government speaks with a unified voice, Ms. Carlton's concealment of the potential exculpatory evidence since at least May 2018 also must be considered in the bad faith analysis. Accordingly, bad faith must be found.

### III. THE GOVERNMENT MISLEAD THE COURT WITH REGARD TO THE STATE GRAND JURY RECORDS

In failing to disclose the existence of the state grand jury transcripts to either defense counsel or the Court and in advising the Court that such records were irrelevant or nonexistent, the Government misled the Court regarding the relevance and materiality of the transcripts produced to date. Knowing how critical the testimony of LaQuante Adams and others was to the Government's case, the Government nevertheless argued that the unproduced transcripts were meaningless.[11] Failing to disclose the existence of Courtney Davis and potentially others as

---

claim fully.

[11] It appears from the record that both Ms. Carlton and Mr. Huber (the most innocent of Government actors) were

12

witnesses has impacted the Defendant's right to a fair trial.

The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, guarantees the accused the right to compulsory process for witnesses in his defense. *Rock v. Arkansas*, 483 U.S. 44, 52, (1987). The Due Process right to a fair trial necessarily incorporates this compulsory process right as a right to obtain a witness in one's favor is part of the due process "right to fairly present a defense." *Park v. Thompson*, 851. F.3d 910, 923 (9th Cir. 2017). When the prosecution substantially interferes with a defendant's right to call a witness whose testimony would have been both material and favorable to his defense, the defendant' compulsory rights have been violated. *Id.*

With regard to the grand jury records, Mr. Newman's Affidavit makes clear that even after discovering the issue at hand, he has failed to act. As of the filing of his Affidavit, he knew there were other state grand juries who potentially investigated these defendants, but he had not located the tapes. Mr. Newman states "I have not provided any of the recordings to these special grand juries to the prosecution team in this case." Knowing full well how important this issue was to the case, why has Mr. Newman failed to act to secure and produce these tapes? Such conduct is inexcusable. Accordingly, the Government's underhanded efforts to withhold the name of witnesses. their failure to maintain potentially exculpatory evidence, and the failure to even attempt to locate and produce *Brady* material rises to the level of a Due Process violation and sanctions must follow.

### IV. THE EXTENT OF THE GOVERNMENT'S DISCOVERY VIOLATIONS ARE NOT ISOLATED TO THE FAILURE TO DISCLOSE STATE GRAND JURY TESTIMONY

---

both unaware of the scope of Mr. Newman's failures with regard to the transcripts. To the credit of the Assistant United States Attorneys, when it appeared that Mr. Newman had failed to produce the necessary records, the Government requested time to investigate the matter.

For over a year, the Court and counsel have labored to ensure that each side is fully prepared for trial. There have been multiple pre-trial conferences and hearings. Scheduling Orders have been entered and amended. The discovery cut-off date has come and gone, but the Government continues, to this day, to ignore its discovery obligations.

For example, on the eve of trial the Government produced the long-lost Deshaun Anthony video which contained potentially exculpatory evidence. In that video, Mr. Anthony is seen preparing a "gang roster." This roster was requested on the first day of trial and has not been produced. Last week, the Government was directed by this Court to provide an update as its efforts to locate this chart. As of the filing of this Motion, no such update has been provided. The seriousness of this, in relation to the defendant who faces the possibility of a mandatory life sentence, cannot be overstated. Nor does it need to be repeated, due to the Court itself expressing its outrage and incredulity at the Government's actions.

V. **THE FAIR AND APPROPRIATE REMEDY FOR THE EGREGIOUS CONDUCT, IN THE CONTEXT OF THIS CASE, IS DISMISSAL WITH PREJUDICE**

As the Supreme Court of the United States once powerfully wrote:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629 (1935).[12]

---

[12] The holding of this case was overruled on other grounds by *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270 (1960) but the statement is not diluted by such action.

The American Bar Association Rules of Professional Conduct place a heightened duty on prosecutors. *See* R. 3.8 of the Model Rules of Professional Responsibility ("Special responsibilities of a Prosecutor").

It has been discovered that the Government, through at least two of her actors and especially Mr. Newman, concealed material and exculpatory information in the form of sworn grand jury testimony of witnesses and defendants. This is not an isolated incident of one missing transcript or a solitary shell casing which was omitted, it is an omission of the highest caliber. It is either born of gross negligence, overzealousness, or both. Dismissal is the only remedy.

The dismissal of an indictment due to prosecutorial misconduct is an exercise of the Court's general supervisory powers concerning the administration of justice. The Court should not consider dismissal unless it finds that the defendant suffered prejudice. *United States v. Derrick*, 163 F.3d 799, 806 (4th Cir. 1998) (*citing United States v. Hastings*, 461 U.S. 499, 505 (1983)). The sanction of dismissal requires conduct "so outrageous as to shock the conscience of the court." *United States v. Dyess*, 478 F.3d 224, 234 (4th Cir. 2007) (*quoting United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991)). Due to this high standard, the Fourth Circuit has "emphasized that these claims will be recognized only in rare cases." *Id*. (*citing United States v. Jones*, 18 F.3d 1145, 1154 (4th Cir. 1994). United States v. Burns (W.D. Va., 2016)

Here, the Court need only consult its original and visceral reaction to this discovery to find that it shocks the conscience. It defies all logic and effort to think that sworn grand jury testimony was withheld (and was never going to be produced but for the actions of Paul Beers) when the very person who conducted the grand jury was seated at counsel table. It further shocks the conscience that the Court has been lied to and that with each passing hour we continue to learn more about the Government's failure to secure exculpatory material from its

15

agents.  Finally, it shocks the conscience to know that sworn grand jury testimony that may assist these defendants has been lost forever.  From these misrepresentations, omissions, and evasions, it is clear that the only remedy is dismissal.

**CONCLUSION**

As of the date and time of this filing, it is still far from clear what information is still to be revealed to the defendant.  Other grand jury testimony exists.  Witness names and subpoena lists have been lost.  Tapes have not been transcribed.  Exculpatory evidence has been revealed just hours before this Motion.

The Court knows the law, and the facts before the Court are clear.  And it is all just too much.  The Defendant does not intend to engage in hyperbole, but he, through his counsel, asserts that his fundamental rights as a citizen under the Constitution of the United States have been violated by the agents of that same Sovereign, and the only and sufficient remedy for such a violation is for him to be restored to his liberty, and to have the charges against him dismissed with prejudice.  He prays this Court to do just that.

Respectfully submitted,

SHABBA LARUN CHANDLER

By: /s/     Jeffrey Laing Dorsey
      Of Counsel

Jeffrey L. Dorsey, Esq. (VSB #32702)
JEFFREY L. DORSEY, P. C.
25 Library Square
Salem, Virginia 24153
(540) 389-8800 (telephone)
(540) 389-7122 (facsimile)
jeff@dorseylawfirm.com

Aaron B. Houchens, Esq. (VSB #80489)
AARON B. HOUCHENS, P.C.
111 East Main Street
P.O. Box 1250
Salem, Virginia 24153
540-389-4498 (telephone)
540-339-3903 (facsimile)
aaron@houchenslaw.com

*Counsel for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that on this 20th of October 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and the foregoing was electronically transmitted through the CM/ECF system to the following CM/ECF participants:

Ronald Huber, Esq.
Heather L. Carlton, Esq.
Assistant United States Attorneys
U.S. Attorney's Office for the Western District of Virginia
U.S. Courthouse and Federal Building
255 West Main Street
Charlottesville, Virginia 22902
ron.huber@usdoj.gov
heather.carlton@usdoj.gov

/s/   Jeffrey Laing Dorsey